**WINDWARD SHIPPING (LONDON) LIM-
ITED et al., Appellants,**

v.

**AMERICAN RADIO ASSOCIATION AFL–
CIO et al., Appellees.**

**No. 635.**

Court of Civil Appeals of Texas,
Houston (14th Dist.).

May 17, 1972.

Rehearing Denied June 14, 1972.

W. D. Deakins, Jr., John Smither, Vinson, Elkins, Searls & Smith, Ben L. Reynolds, Royston, Rayzor, Cook & Vickery, Houston, for appellants.

Herman V. Wright, Mandell & Wright, W. Arthur Combs, Combs & Archer, Houston, Bertram Perkel, Schulman, Abarbanel, Perkel & McEvoy, New York City, for appellees.

TUNKS, Chief Justice.

In October of 1971 the cargo vessels Northwind and Theomana, both of Liberian registry, were docked at the Port of Houston for the purpose of loading and unloading cargo. American Radio Association, AFL-CIO and five other deep sea maritime unions, acting in concert, established picket lines which longshoremen and other workmen would not cross to service such vessels. The owners of the vessels filed suit in the district court in Harris County to enjoin permanently such picketing. The district

court, after hearing evidence, dismissed the owners' suit, concluding that the court was without jurisdiction because of pre-emption by the National Labor Relations Board. The owners have appealed. We affirm the trial court's judgment of dismissal.

The basic facts of the case were established by stipulation or uncontroverted evidence. The vessels in question carry cargo between United States ports and foreign ports. They do not carry cargo from one port in the United States to another port in the United States. The crews and officers of the vessels are foreign nationals. There is no labor dispute between the owners of the vessels and their crews or the foreign unions who represent them or on the foreign contracts under which · they work. The picketing unions neither have nor claim the right to represent the crews, nor do they seek to obtain such right. None of the crew members are members of the picketing unions. The picketing has been peaceful and without violence or threat of violence.

Four pickets commenced picketing the Theomana at the Port of Houston on October 28, 1971, and four began picketing the Northwind the following day. Signs carried by the pickets bore the following message:

### "ATTENTION TO THE PUBLIC

The wages and benefits paid seamen aboard the vessel THEOMANA (NORTHWIND) are substandard to those of American seamen. This results in extreme damage to our wage standards and loss of our jobs. Please do not patronize this vessel. Help the American seamen. We have no dispute with any other vessel on this site." (Parenthesis added)

The signs bore the names of the picketing unions.

The pickets did not speak to anyone. When inquiry was made of them they handed out literature in the following language:

### "TO THE PUBLIC

American Seamen have lost approximately 50% of their jobs in the past few years to foreign flag ships employing seamen at a fraction of the wages of American Seamen.

American dollars flowing to these foreign ship owners operating ships at wages and benefits substandard to American Seamen, are hurting our balance of payments in addition to hurting our economy by the loss of jobs.

A strong American Merchant Marine is essential to our national defense. The fewer American flag ships there are, the weaker our position will be in a period of national emergency.

PLEASE PATRONIZE AMERICAN FLAG VESSELS, SAVE OUR JOBS, HELP OUR ECONOMY AND SUPPORT OUR NATIONAL DEFENSE BY HELPING TO CREATE A STRONG AMERICAN MERCHANT MARINE.

Our dispute here is limited to the vessel picketed at this site, the SS ———".

This literature, too, had on it the names of the picketing unions.

The refusal of longshoremen and others to cross the picket lines resulted in damage to the vessels' owners which the unions agree is incalculable.

The first step taken to stop the picketing was the filing, in behalf of the owner of the Theomana, of a complaint with the NLRB charging the unions with secondary picketing. The next day suit was filed in behalf of such owner in the district court of Harris County seeking temporary and permanent injunction. The petition in that suit also alleged that the unions were guilty of secondary picketing. The complaint with the NLRB was voluntarily with-

drawn by the complainant. The pleadings in the district court of Harris County were amended. Those pleadings as amended alleged, in behalf of the owners of both vessels, that the picketing by the defendant unions was for the purpose of inducing the owners to breach their contracts with their crews and the foreign union representing those crews. It was alleged that such activity was in violation of Tex.Rev.Civ. Stat.Ann. art. 5154d, sec. 4 (1947) and was a tort under Texas law.

The unions answered to the suit filed by the owners, asserting the defenses that: (1) The jurisdiction over the subject matter of the dispute was pre-empted to the NLRB by the Labor Management Relations Act, 29 U.S.C. sec. 151 et seq. (1947). (2) The Norris-LaGuardia Act 29 U.S.C. sec. 101, et seq. (1932), prohibited the granting of the injunction sought. (3) The activities sought to be enjoined were protected by constitutional guaranties of free speech. (4) Tex.Rev.Civ.Stat.Ann. art. 5154d, sec. 4 (1947), if applicable to their activities, would be unconstitutional. (5) The owners were without clean hands in that their conduct was contrary to the public policy of the United States to promote the merchant marine, as pronounced in 46 U.S.C. sec. 1101 and sec. 1241 (1970). The trial court sustained the first of those asserted defenses and did not make findings of fact or conclusions of law relating to the others. We shall likewise confine our discussions to the jurisdictional pre-emption question.

█ Since San Diego Building Trades Council v. Garmon, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959), state jurisdiction in cases of labor disputes has been compelled to yield to the jurisdiction of the NLRB if the activities complained of are arguably either protected by section 7 or prohibited by section 8 of the NLRA as amended by the LMRA. The determination of whether activity in fact is or is not protected or proscribed by the statute is initially for the NLRB. Failure of the Board to determine the status of the activity does not pass jurisdiction to the state

courts. After the Garmon case state jurisdiction notwithstanding federal pre-emption rules is confined to (1) those cases involving libel, Linn v. United Plant Guard Workers Local 114, 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966), and other matters "deeply rooted in local feeling or responsibility", Garmon, supra; (2) cases in which jurisdiction has been ceded to the state by the NLRB by virtue of 29 U.S.C. sec. 160(a) (1959); (3) cases in which the disputed activity is a "merely peripheral concern" of the LMRA, Garmon, supra, (e. g., breach of contract, damages for wrongful expulsion from a union); (4) cases in which the NLRB refuses jurisdiction; and (5) those cases involving violence, e. g., International Union, Etc. v. Russell, 356 U.S. 634, 78 S.Ct. 932, 2 L.Ed. 2d 1030 (1958); International Ass'n of Machinists v. Gonzales, 356 U.S. 617, 78 S.Ct. 923, 2 L.Ed.2d 1018 (1958); United Const. Workers, Etc. v. Laburnum Const. Corp., 347 U.S. 656, 74 S.Ct. 833, 98 L.Ed. 1025 (1953); Youngdahl v. Rainfair, Inc., 355 U.S. 131, 78 S.Ct. 206, 2 L.Ed.2d 151 (1957); United Auto., A. & A. I. W. v. Wisconsin Emp. Rel. Bd., 351 U.S. 266, 76 S.Ct. 794, 100 L.Ed. 1162 (1955). The courts of Texas have adhered to these principles. Ex Parte Dilley, 160 Tex. 522, 334 S.W.2d 425 (1960); Carpenters & Joiners Local Union No. 1097 v. Hampton, 457 S.W.2d 299 (Tex.Civ.App.–Tyler 1970, no writ).

█ This Court's primary inquiry, then, is whether the appellees' picketing here in question was arguably prohibited or protected under the LMRA (29 U.S.C. sec. 157 and sec. 158). As appellants point out, appellees' picketing carefully remained within the guidelines for permissible picketing on the premises of a secondary employer promulgated in Sailor's Union of the Pacific, 92 N.L.R.B. 547 and adopted in Local 761, Inter. Union of Elec., Radio and Mach. Wkrs. v. NLRB, 366 U.S. 667, 81 S. Ct. 1285, 6 L.Ed.2d 592 (1961). These principles, commonly referred to as the "Moore Dry Dock Rules", consider picket-

ing of a secondary employer's premises lawful primary activity when it meets these conditions:

(1) The picketing is strictly limited to times when primary employees are present at the premises of the secondary employer or at the common premises.

(2) The primary employer is engaged in his normal business at the picketed premises at the time of the picketing.

(3) The picketing is limited to places reasonably close to the locations on the premises where the employees of the primary employer are at work.

(4) The picketing clearly discloses that the dispute is with the primary employer alone.

(5) The primary employer has no separate place of business at which a reasonable opportunity is afforded to reach his employees by picketing.

In the instant case the evidence reveals that appellees picketed only when the vessels of the appellants, primary employers, were dockside. Secondly, when picketed the ships were being loaded and unloaded, part of the usual operation of cargo ships and the normal business of the primary employers. Moreover, the picketing was limited to the dock at which the vessels were berthed. Further, the signs carried by the picketers clearly restricted the picketing to the primary employer. And, the two ships were the only reasonably accessible places of business to which the unions could direct their attention and efforts. Accordingly, appellees were not engaged in a secondary boycott. No other violation of section 8 is intimated by the parties and none other appears from the record.

We must, then, consider whether appellees' conduct was arguably protected under section 7 of the LMRA.

Section 7 is in the following language:

"Employees shall have the right to self-organization, to form, join, or assist la-bor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a) (3) of this title."

■ Peaceful picketing has repeatedly been held protected by this section of the NLRA (amended by LMRA, 29 U.S.C. sec. 157). Garner v. Teamsters, Chauffeurs and Helpers, Etc., 346 U.S. 485, 74 S.Ct. 161, 98 L.Ed. 228 (1953); Carter Carburetor Corp. v. National Labor R. Board, 140 F.2d 714 (8th Cir. 1944); National Labor Relations Board v. Thayer Co., 213 F.2d 748 (1st Cir. 1954); Edir, Inc. d/b/a Wolfie's v. Club & Restaurant Employees and Bartenders' Union Local No. 133, AFL-CIO, et al., 159 N.L.R.B. 72 (1966); Sears-Roebuck & Company v. Retail Store Employees' Union, Local 345, AFL-CIO, 168 N.L.R.B. 126 (1967). And see Cox, The Right to Engage in Concerted Activities, 26 Ind.L.J. 319 (1951). The Supreme Court has expressly recognized that a union's peaceful picketing to protest wage rates below established area standards arguably constitutes protected activity under section 7. International Longshoremen's Ass'n, Local 1416 v. Ariadne Shipping Co., 397 U.S. 195, 90 S.Ct. 872, 25 L.Ed.2d 218 (1970), and cases cited therein. This is the now well-recognized "area standards" picketing.

One case is persuasive authority in support of the trial court's order of dismissal. In South Georgia Co., Ltd. v. Marine Engineers Beneficial Ass'n, 44 CCH Lab. Cas. 26,269 (La.Dist.Ct.1961) picketing of a foreign ship with a foreign crew by an American union to protest loss of jobs by U. S. seamen from use of that ship to transport cargo purchased by Indonesia under the Agricultural Trade Development and

Assistance Act was held to be arguably protected by section 7 of the L.M.R.A.

In Ex Parte George, 163 Tex. 103, 358 S.W.2d 590 (1962), vacated 371 U.S. 72, 83 S.Ct. 178, 9 L.Ed.2d 133 (1963), on remand 364 S.W.2d 189 (Tex.Sup.1963), an American maritime union which represented unlicensed crew members on American Oil Company vessels was involved in a labor dispute with that company. The union picketed the main gate and parking lot gate at a coastal refinery operated by a wholly-owned subsidiary of American Oil. Workers at the refinery were represented by a separate union. Despite a finding, supported by the record, that the union's purpose was to induce the violation of American Oil's existing contract with the refinery worker's union (a violation of Art. 5154d here in question), the U. S. Supreme Court held that the maritime union's picketing was arguably protected by section 7.

In this case with facts not so gross as those in Ex Parte George, there appears no persuasive reason to hold contrary to the Supreme Court's holding in George. In fact, appellants do not argue that the appellees' picketing is not of a character sufficient to fall within section 7's protection. Rather, they contend that the LMRA "does not extend to the maritime operations of foreign-flag ships employing foreign aliens, and that American union activity which affects the internal affairs of the ship and its foreign crew is not protected by the Act." Appellants base their contention on three cases: Benz v. Compania Naviera Hidalgo, S. A., 353 U.S. 138, 77 S.Ct. 699, 1 L.Ed.2d 709 (1957); McCulloch v. Sociedad Nacional, Etc., 372 U.S. 10, 83 S.Ct. 671, 9 L.Ed.2d 547 (1963); and Incres Steamship Co. v. International Maritime Workers Union, 372 U.S. 24, 83 S.Ct. 611, 9 L.Ed.2d 557 (1963). All three of those cases involved foreign-owned and registered ships with alien crews under foreign articles. In Benz the crew members went on strike and their cause was taken up successively by three different American unions. In McCulloch an American union

petitioned for certification as the representative of foreign crewmen and the NLRB ordered an election. In Incres an American union picketed as part of its campaign to organize foreign crewmen. In each case the Supreme Court held that the NLRA, as amended, does not apply to foreign-registered ships employing alien seamen. This is so because the NLRB's jurisdiction is based upon circumstances "affecting commerce" and the Court concluded that maritime operations of foreign-flag ships employing alien crewmen are not "in commerce" as that term is contemplated by section 2(6) (29 U.S.C. sec. 152(6) (1947)).

McCulloch and Incres were decided on the basis of Benz. In Marine Cooks and Stewards v. Panama S. S. Co., 362 U.S. 365, 80 S.Ct. 779, 4 L.Ed.2d 797, the Supreme Court, while involved in a construction of the Norris-LaGuardia Act, drew an important distinction between the facts in Benz and those in Marine Cooks. The Court noted that in Benz an American union, to which none of the alien crew members belonged, had a substantial, immediate interest in the "internal economy" of the ship. The Marine Cooks case involved facts essentially the same as now before us (except that picketing was by boat and not at the dock of consignee, although that was expressly threatened). Justice Black, speaking for eight justices (Justice Whittaker dissented on a separate issue), viewed the union members' interest there as being "in preserving job opportunities for themselves in this country," [362 U.S. page 371, 80 S.Ct. page 784] not in the "internal economy" of the foreign vessel. They were picketing on their own behalf and not for the benefit of foreign employees. The opinion labeled the dispute as domestic even though the employer was foreign.

The Benz case was distinguished from a case factually identical to the present case on the basis of the distinction noted by Justice Black in Marine Cooks. South Georgia Co., Ltd. v. Marine Engineers

Beneficial Ass'n, supra. The Court in South Georgia characterized Benz as involving only "an internal dispute on a foreign ship." In Madden v. Grain Elevator, Flour & Feed Mill Wkrs., etc., 334 F.2d 1014 (7th Cir. 1964) the Seventh Circuit rejected a union's contention that, based upon Incres, the NLRB lacked jurisdiction of a dispute involving union members' refusal to unload ships so as to compel their employer to cease doing business with a Canadian shipping company. In passing on a contempt order arising from a secondary boycott complaint, the Court found that no attempt was being made to apply the NLRA to "the internal management or affairs" of the vessels involved. In a subsequent chapter of the same dispute the D.C. Circuit sustained the finding of the Seventh Circuit that Incres was inapplicable. Grain Elevator, Flour and Feed Mill Workers, Int. Longshoremen Ass'n Loc. 418 v. NLRB, 126 U.S.App.D.C. 219, 376 F.2d 774 (1967). These cases construe the Incres case to hold not that the NLRB lacks jurisdiction of *any* "maritime operations" of a foreign ship and crew, but that the Board lacks jurisdiction over the "internal affairs" of a foreign ship and crew. This is a more narrow and precise area of activity and one which hints of exclusion of the usual elements of a cargo-carrying operation and focuses only upon crew-owner relations.

In 1970 the Supreme Court was presented with a case of union picketing to protest the substandard wages paid by foreign-flag vessels to American longshoremen in American ports. International Longshoremen's Ass'n Local 1416 v. Ariadne Shipping Co., supra. The question of pre-emption was squarely at issue. Lower courts had held no pre-emption because the NLRB lacked jurisdiction. McCulloch and Incres were the authority for that holding. The Supreme Court reversed and held that the longshore activities of American longshoremen were not within the maritime operations of foreign-flag vessels. The Court carefully pointed out that the construction of the federal statute in Benz, McCulloch and Incres,

". . . was addressed to situations in which Board regulation of the labor relations in question would necessitate inquiry into the 'internal discipline and order' of a foreign vessel . . .".

The Court concluded that the functions of the American longshoremen did not constitute involvement with the ships' "internal discipline and order". Application of American labor statutes to resolve a conflict over wages paid to American longshoremen thus would not interfere with the foreign ships' internal affairs. Consequently the longshoremen's operations were "in commerce" and could be subject to the board's jurisdiction.

■ There is still no clear statement of the Supreme Court's position as to whether the NLRB has jurisdiction of, as here, picketing by American *seamen* to protest substandard wages and conditions on foreign vessels. The picketing in the Ariadne case could not have been any less destructive to the cargo-carrying business of the ships than the protracted picketing and conflict in Benz. So, it seems that the terms "internal affairs" and "internal order and discipline" must refer to the relationship between crew and employer and not to the carrying-on of the business for which the vessel is employed (a matter between shipowner and shipper). This construction has support in the language employed by the Court in the Ariadne case where the Court refers to the crucial term "internal affairs" of the foreign ship as affairs "which would be governed by foreign law," i. e., (see footnote 4) the foreign ships' articles. Ships' articles concern such matters as seamen's conduct and obedience, wages, seamen's liability for cargo damaged or embezzled, competency in performance of seamen's duties and airing of seamen's grievances. See, e. g., 46 U.S.C. sec. 713 (1946). The issue in McCulloch and Incres was representation of foreign seamen. In Benz it was picketing to support a strike by the foreign crew members. To allow American unions to intercede in those instances would clearly be to allow interfer-

ence with the internal order, discipline and affairs of a foreign ship. In Ariadne the Court confronted a situation involving American workers hired by foreign ships to serve, not as seamen, but as longshoremen. As noted before, the Court held that the longshoremen's activities performed by Americans were not an element of the "foreign ships'" internal affairs.

Ariadne differs from the instant case in at least two respects. First, it dealt with longshoremen rather than seamen. Further, it concerned picketing in regard to wages to be paid to American workers who were employed by foreign employers. The casual connection between American longshoremen's duties and the foreign vessels is what excluded those functions from the reach of the term "internal discipline and order." The Court expressly reserved the question of longshore work performed by foreign crewmen. But in this case there are no American residents employed by foreign ship owners. The protest is not directed to allegedly substandard wages paid by foreign shipowners to then-employed American seamen, but to allegedly substandard wages paid to foreign seamen, with a concurrent request to the public not to patronize the foreign ships. There is no direct interference with the relationship between employer and crewmen. Any direct interference is between the consignee and the shipowner, or the shipowner and the stevedore company. The fact that appellees are seamen and not merely longshoremen cannot indicate greater involvement in the internal affairs of the ships because none are employed on those ships.

 It is important also to note that the Court in Ariadne focused upon the effect of longshore work upon the ships' internal affairs and not upon the purpose and intent of the picketers. The purpose of the activity in question is not of controlling significance in deciding the question of jurisdiction of the activity. (See, e. g., Chief Justice Calvert's dissenting opinion in Ex Parte George, 163 Tex. 103, 358 S.W.2d 590, 607). If the picketing intervenes in an alien crewmen's strike or strives to organize those crewmen it constitutes involvement with matters not "in commerce". If it but voices a complaint as to foreign wages and urges the public not to patronize foreign vessels it does not engage in matters outside of commerce. It is peaceful picketing, publicizing a labor dispute, of such a character that its validity is suggested by the Court's holding in the Marine Cooks case, supra. It is, at least arguably, a protected activity under section 7 of the LMRA. As such, it is an activity as to which the exclusive jurisdiction to determine its propriety has been pre-empted to the NLRB. Upon that basis the trial court properly dismissed the plaintiffs' suit for want of jurisdiction.

Affirmed.