# WINDWARD SHIPPING (LONDON) LTD. ET AL. v. AMERICAN RADIO ASSOCIATION, AFL–CIO, ET AL.

No. 72–1061.   Argued December 3–4, 1973—
Decided February 19, 1974

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, STEWART, BLACKMUN, and POWELL, JJ., joined. BRENNAN, J., filed a dissenting opinion, in which DOUGLAS and MARSHALL, JJ., joined, post, p. 116.

*Robert S. Ogden, Jr.,* argued the cause for petitioners. With him on the briefs were *James V. Hayes* and *Joseph E. Fortenberry.*

*Howard Schulman* argued the cause for respondents. With him on the brief was *W. Arthur Combs.**

MR. JUSTICE REHNQUIST delivered the opinion of the Court.

Petitioners are the owners and managing agents of two ships which are registered under the laws of Liberia and fly the Liberian flag. They sought injunctive relief in the state courts in Texas to bar picketing of their vessels by respondent unions. The trial court denied relief, finding that the dispute was "arguably" within the jurisdiction of the National Labor Relations Board and that the jurisdiction of the state courts was therefore pre-empted. The Texas Court of Civil Appeals affirmed,[1] and we granted certiorari, 412 U. S. 927 (1973), to consider whether the activities here complained of were activities "affecting commerce" within the meaning of §§ 2 (6) and (7) of the National Labor Relations Act, 49 Stat. 450, 29 U. S. C. §§ 152 (6) and (7).[2] We hold that they were

---

*Briefs of *amici curiae* urging reversal were filed by *Solicitor General Bork* and *Allan A. Tuttle* for the United States; by *Frank L. Wiswall, Jr.,* for the Republic of Liberia; by *Bryan F. Williams, Jr.,* for the West Gulf Maritime Assn., Inc.; and by *Frank McRight* for the Mobile Steamship Assn.

*J. Albert Woll, Laurence Gold,* and *Thomas E. Harris* filed a brief for the American Federation of Labor and Congress of Industrial Organizations as *amicus curiae* urging affirmance.

[1] 482 S. W. 2d 675 (1972).

[2] The definitions in §§ 2 (6) and (7), 29 U. S. C. §§ 152 (6) and (7), as amended by the Labor Management Relations Act, 1947, are as follows:

"(6) The term 'commerce' means trade, traffic, commerce, transportation, or communication among the several States, or between the District of Columbia or any Territory of the United

not, and therefore reverse the judgment of the Court of Civil Appeals.

## I

The vessels *Northwind* and *Theomana* are ships of Liberian registry, carrying cargo between foreign ports and the United States. *Northwind* is owned by petitioner Westwind Africa Line, Ltd., a Liberian corporation, while *Theomana* is owned by petitioner SPS Bulkcarriers Corp., a Liberian corporation, and managed by petitioner Windward Shipping (London) Ltd., a British corporation. The crews of both vessels are composed entirely of foreign nationals, represented by foreign unions and employed under foreign articles of agreement.

Respondents are American maritime unions, apparently representing a substantial majority of American merchant seamen.[3] Alarmed by an accelerating decline in the number of jobs available to their members, these unions agreed to undertake collective action against foreign vessels, which they saw as the major cause of their business recession. Specifically, these unions agreed to picket foreign ships, calling attention to the competitive advantage enjoyed by such vessels because of a difference

States and any State or other Territory, or between any foreign country and any State, Territory, or the District of Columbia, or within the District of Columbia or any Territory, or between points in the same State but through any other State or any Territory or the District of Columbia or any foreign country.

"(7) The term 'affecting commerce' means in commerce, or burdening or obstructing commerce or the free flow of commerce, or having led or tending to lead to a labor dispute burdening or obstructing commerce or the free flow of commerce."

[3] Respondents describe themselves in their brief as "six labor organizations who collectively represent the overwhelming majority and practically almost all American merchant seamen." Brief for Respondents 2.

between foreign and domestic seamen's wages. All parties concede that such a difference does exist.[4]

The picketing here occurred at the Port of Houston, Texas, in October 1971. Both *Northwind* and *Theomana* were docked within the port, and respondents established picket lines in front of each vessel. There were four pickets assigned to each vessel, carrying signs which read:

"ATTENTION TO THE PUBLIC
THE WAGES AND BENEFITS PAID SEAMEN
ABOARD THE VESSEL THEOMANA [NORTH-
WIND] ARE SUBSTANDARD TO THOSE OF
AMERICAN SEAMEN. THIS RESULTS IN EX-
TREME DAMAGE TO OUR WAGE STANDARDS
AND LOSS OF OUR JOBS. PLEASE DO NOT
PATRONIZE THIS VESSEL. HELP THE
AMERICAN SEAMEN. WE HAVE NO DISPUTE
WITH ANY OTHER VESSEL ON THIS SITE."
[Printed names of the six unions.]

These signs were supplemented by pamphlets of similar import.[5] The pickets were instructed not to

---

[4] The petitioners state:

"We do not contest the fact that the wages of foreign crews on foreign ships are substantially lower than those paid to American seamen on American ships." Brief for Petitioners 19.

The brief notes some estimates that the American wage costs are between 2½ to 4 times higher than the foreign wage costs. *Id.,* at 19 n.

[5] These pamphlets stated:

"To the Public—American Seamen have lost approximately 50% of their jobs in the past few years to foreign flag ships employing seamen at a fraction of the wages of American Seamen.

"American dollars flowing to these foreign ship owners operating ships at wages and benefits substandard to American Seamen, are hurting our balance of payments in addition to hurting our economy by the loss of jobs.

"A strong American Merchant Marine is essential to our national

discuss the picketing with anyone, and they appear to have followed their instructions.

The picketing, although neither obstructive nor violent, was not without effect. Longshoremen and other port workers refused to cross the picket lines to load and unload petitioners' vessels. Petitioners filed separate suits in a Texas state court, asking the court to enjoin the picketing as tortious under Texas law. The primary basis for petitioners' claim was that the picketing sought to induce the owners and crews to break pre-existing contracts. Respondents presented several defenses, contending in particular that the jurisdiction of the Texas court was pre-empted by the National Labor Relations Act.[6]

The trial court sustained this contention, holding that jurisdiction properly lay with the NLRB, and the Texas Court of Civil Appeals affirmed. That court found that state jurisdiction was pre-empted by the Act when "the activities complained of are arguably either protected by section 7 or prohibited by section 8 of the NLRA as amended by the LMRA,"[7] see *San Diego Building Trades Council* v. *Garmon,* 359 U. S. 236 (1959), and that the conduct here met that test. The court rejected petitioners' argument that the picketing interfered with the "maritime operations of foreign-flag

---

defense. The fewer American flag ships there are, the weaker our position will be in a period of national emergency.

"PLEASE PATRONIZE AMERICAN FLAG VESSELS, SAVE OUR JOBS, HELP OUR ECONOMY AND SUPPORT OUR NATIONAL DEFENSE BY HELPING TO CREATE A STRONG AMERICAN MERCHANT MARINE.

"Our dispute is limited to the vessel picketed at this site, the S. S. ———" (App. 21).

[6] The courts below considered only this ground advanced by respondents, finding it dispositive. We express no opinion on the merits of respondents' other contentions.

[7] 482 S. W. 2d, at 678.

ships," see *McCulloch* v. *Sociedad Nacional,* 372 U. S. 10 (1963), in such manner as to remove it from the Board's jurisdiction.[8]  The court concluded:

> "If [the picketing] but voices a complaint as to foreign wages and urges the public not to patronize foreign vessels it does not engage in matters outside of commerce.  It is peaceful picketing, publicizing a labor dispute, of such a character that its validity is suggested by the Court's holding in the Marine Cooks case, supra.  It is, at least arguably, a protected activity under section 7 of the LMRA.  As such, it is an activity as to which the exclusive jurisdiction to determine its propriety has been preempted to the NLRB." [9]

Petitioners contend that the Court of Appeals too narrowly construed this Court's decisions denying the NLRB jurisdiction in cases involving foreign-flag ships. We therefore begin by examining the principles established by those decisions for determining the jurisdiction of the NLRB.

## II

In a series of cases decided over the past 17 years,[10] this Court has discussed the application of the Labor Management Relations Act in situations which might be broadly described as disputes between unions representing workers in this country and owners of foreign-flag vessels operating in international maritime commerce.  *Benz* v. *Compania Naviera Hidalgo,* 353 U. S. 138 (1957), is the leading case on the subject.  In *Benz*

---

[8] *Id.,* at 680–682.

[9] *Id.,* at 682.

[10] *Benz* v. *Compania Naviera Hidalgo,* 353 U. S. 138 (1957); *McCulloch* v. *Sociedad Nacional,* 372 U. S. 10 (1963); *Incres S. S. Co.* v. *Maritime Workers,* 372 U. S. 24 (1963); *Longshoremen* v. *Ariadne Co.,* 397 U. S. 195 (1970).

the question was whether the Labor Management Relations Act, 1947, precluded a diversity suit for damages brought in the United States District Court by foreign shipowners against picketing American unions. The picketing had been undertaken in Portland, Oregon, to support striking foreign crews employed under foreign articles and had resulted in the refusal of workers to load and repair the docked foreign ships. The District Court had awarded damages and the Court of Appeals affirmed.

This Court held that the shipowners' action was not pre-empted by the Labor Management Relations Act. Studying the legislative history of the Act, the Court found no indication that it was intended to govern disputes between foreign shipowners and foreign crews. On the contrary, the Court concluded that the most revealing legislative history strongly suggested the bill was a "bill of rights . . . for *American* workingmen and for their employers." *Id.*, at 144. (Emphasis in original.) The Court stated that this history "inescapably describes the boundaries of the Act as including only the workingmen of our own country and its possessions." *Ibid.*

Recognition of the clear congressional purpose to apply the LMRA only to American workers and employers was doubtless a sufficient reason to place the picketing in *Benz* outside the Act. But the Court in that case made clear its reluctance to intrude domestic labor law willy-nilly into the complex of considerations affecting foreign trade, absent a clear congressional mandate to do so:

"For us to run interference in such a delicate field of international relations there must be present the affirmative intention of the Congress clearly expressed. It alone has the facilities necessary to make fairly such an important policy decision where the

possibilities of international discord are so evident and retaliative action so certain." *Id.,* at 147.

In the 17 years since *Benz* was decided, Congress has in no way indicated any such "affirmative intention," and this Court has continued to construe the LMRA in accordance with the dictates of that case.

The reasoning of *Benz* was reaffirmed in *McCulloch* v. *Sociedad Nacional,* 372 U. S. 10 (1963), and *Incres S. S. Co.* v. *Maritime Workers,* 372 U. S. 24 (1963), decided together six years later. In *McCulloch,* we held that the National Labor Relations Board had improperly assumed jurisdiction under the Act to order an election involving foreign crews of foreign-flag ships. Rejecting the Board's "balancing of contacts" theory, the Court said:

"[T]o follow such a suggested procedure to the ultimate might require that the Board inquire into the internal discipline and order of all foreign vessels calling at American ports." 372 U. S., at 19.[11]

In *Incres* we applied this rationale to a situation involving union picketing of a foreign ship in an effort to organize the foreign crew. Reversing the holding. of a New York state court that the picketing was arguably within the jurisdiction of the NLRB, the Court said:

"The Board's jurisdiction to prevent unfair labor practices, like its jurisdiction to direct elections, is based upon circumstances 'affecting commerce,' and we have concluded that maritime operations of foreign-flag ships employing alien seamen are not in 'commerce' within the meaning of § 2 (6), 29 U. S. C. § 152 (6)." 372 U. S., at 27.

---

[11] The Court in *McCulloch* also noted that the Board's actions had "aroused vigorous protests from foreign governments and created international problems for our Government." 372 U. S., at 17.

But *Benz* and its successor cases have not been read to exempt all organizational activities from the Act's protections merely because those activities in some way were directed at an employer who was the owner of a foreign-flag vessel docked in an American port. In *Longshoremen* v. *Ariadne Co.*, 397 U. S. 195 (1970), the Court held that the picketing of foreign ships to protest substandard wages paid by their owners to nonunion American longshoremen was "in 'commerce' within the meaning of § 2 (6), and thus might have been subject to the regulatory power of the National Labor Relations Board." *Id.*, at 200. The pickets in *Ariadne*, unlike the pickets in *Benz* or *Incres*, were primarily engaged in a dispute as to whether an employer should hire unionized or nonunionized American workers to perform longshoremen's work,[12] and the substandard wages which they were protesting were being paid to fellow American workers. The Court specifically noted: "[T]his dispute centered on the wages to be paid American residents." *Id.*, at 199.

The term "in commerce," as used in the LMRA, is obviously not self-defining, and certainly the activities in *Benz, McCulloch,* and *Incres,* held not covered by the Act, were literally just as much "in commerce" as were the activities held covered in *Ariadne*. Those cases which deny jurisdiction to the NLRB recognize that Congress, when it used the words "in commerce" in the LMRA, simply did not intend that Act to erase long-

---

[12] The evidence in *Ariadne* showed that the work at issue was performed partly by members of the foreign ships' crews and partly by outside labor. 397 U. S., at 196. Those workers included in the classification "outside labor" were nonunion members. This Court noted that "[t]he participation of some crew members in the longshore work does not obscure the fact that this dispute centered on the wages to be paid American residents, who were employed by each foreign ship not to serve as members of its crew but rather to do casual longshore work." *Id.*, at 199.

standing principles of comity and accommodation in international maritime trade. In *Lauritzen* v. *Larsen*, 345 U. S. 571, 577 (1953), the Court commented on the congressional intent with respect to the Jones Act of 1920 in these words:

> "But Congress in 1920 wrote these all-comprehending words, not on a clean slate, but as a postscript to a long series of enactments governing shipping. All were enacted with regard to a seasoned body of maritime law developed by the experience of American courts long accustomed to dealing with admiralty problems in reconciling our own with foreign interests and in accommodating the reach of our own laws to those of other maritime nations." [13]

We are even more reluctant to attribute to Congress an intention to disrupt this comprehensive body of law by construction of an Act unrelated to maritime commerce and directed solely at American labor relations.

## III

The picketing activities in this case do not involve the inescapable intrusion into the affairs of foreign ships that was present in *Benz* and *Incres;* respondents seek

---

[13] The basic question at issue in *Lauritzen* was whether American or Danish law applied to a maritime tort which occurred in Havana Harbor. Although analysis of the Jones Act there obviously involved different considerations from analysis of the Labor Management Relations Act here, it is interesting to note that some arguments at least are common to both cases. In *Lauritzen* this Court rejected a "candid and brash appeal" made by the seamen and various *amici* that the Court should "extend the law to this situation as a means of benefiting seamen and enhancing the costs of foreign ship operation for the competitive advantage of our own." 345 U. S., at 593. We observed at that time that such arguments were obviously better directed to Congress.

neither to organize the foreign crews for purpose of representation nor to support foreign crews in their own wage dispute with a foreign shipowner. But those cases do not purport to fully delineate the threshold of interference with the maritime operations of foreign vessels which makes the LMRA inapplicable.

The picket signs utilized at the docks where the *Northwind* and *Theomana* were tied up protested the wages paid to foreign seamen who were employed by foreign shipowners under contracts made outside the United States. At the very least, the pickets must have hoped to exert sufficient pressure so that foreign vessels would be forced to raise their operating costs to levels comparable to those of American shippers, either because of lost cargo resulting from the longshoremen's refusal to load or unload the vessels, or because of wage increases awarded as a virtual self-imposed tariff to regain entry to American ports. Such a large-scale increase in operating costs would have more than a negligible impact on the "maritime operations" of these foreign ships, and the effect would be by no means limited to costs incurred while in American ports. Unlike *Ariadne,* the protest here could not be accommodated by a wage decision on the part of the shipowners which would affect only wages paid within this country.

In this situation, the foreign vessels' lot is not a happy one. A decision by the foreign owners to raise foreign seamen's wages to a level mollifying the American pickets would have the most significant and far-reaching effect on the maritime operations of these ships throughout the world. A decision to boycott American ports in order to avoid the difficulties induced by the picketing would be detrimental not only to the private balance sheets of the foreign shipowners but to the citizenry of a country as dependent on goods carried in foreign bottoms as is ours. Retaliatory action against American vessels in

foreign ports might likewise be considered, but the employment of such tactics would probably exacerbate and broaden the present dispute. Virtually none of the predictable responses of a foreign shipowner to picketing of this type, therefore, would be limited to the sort of wage-cost decision benefiting American workingmen which the LMRA was designed to regulate. This case, therefore, falls under *Benz* rather than under *Ariadne*.[14]

Since we hold that respondents' picketing was not "in commerce" as defined by the Act, we do not reach the question of whether the activity was otherwise of such a nature that state courts would be precluded by the LMRA from entertaining an action to enjoin it. Our conclusion that the activities here involved were not "in commerce" within the meaning of §§ 2 (6) and (7) of the NLRA, as amended by the LMRA, resolves a question which, of course, is one for the courts in the first instance. *Ariadne,* 397 U. S., at 200. The Court of Civil Appeals was therefore wrong in holding that the courts of the

---

[14] We do not find the rationale of *Marine Cooks & Stewards* v. *Panama S. S. Co.,* 362 U. S. 365 (1960), to be applicable here. Although that case involved a labor situation strikingly similar to the situation involved in this case, the controlling question in *Marine Cooks* was the jurisdiction of a federal district court to enjoin picketing of a foreign-flag ship under the Norris-LaGuardia Act, 29 U. S. C. § 101 *et seq.* The Court held that in such circumstances the district courts had no jurisdiction. However, as we later noted in *McCulloch,* 372 U. S., at 18, *Marine Cooks* "cannot be regarded as limiting the earlier *Benz* holding . . . since no question as to 'whether the picketing . . . was tortious under state or federal law' was either presented or decided." Obviously the question whether Congress intended the federal courts to stay out of the labor injunction business involves significantly different considerations from the question whether Congress intended the Labor Management Relations Act to apply to the type of picketing of foreign ships involved here.

State of Texas were prevented by the LMRA from enter-
taining petitioners' suit for an injunction.

*Reversed.*

MR. JUSTICE BRENNAN, with whom MR. JUSTICE
DOUGLAS and MR. JUSTICE MARSHALL join, dissenting.

Today's reversal of the Texas Court of Civil Appeals
does not, of course, end this case. There remain for dis-
position on remand two of the respondents' defenses not
reached by the Texas courts, namely (1) that Texas law
does not proscribe respondents' picketing, and (2) that,
in any event, the First and Fourteenth Amendments
protect respondents' conduct.[1]

But the fact that today's decision does not finally
decide the legality of respondents' picketing should not
obscure the significance of the Court's holding. Ninety-
five percent of our export trade has already fled Ameri-
can-flag vessels for cheaper, foreign-registered shipping.[2]
In holding that respondents' picketing against foreign-
flag vessels does not give rise to a dispute "affecting
commerce" within the National Labor Relations Board's
jurisdiction, the Court effectively deprives American sea-
men, among all American employees in commerce, of any
federally protected weapon with which to try to save
their jobs.[3] Additionally, the Court creates new difficul-

---

[1] See *NLRB* v. *Fruit & Vegetable Packers,* 377 U. S. 58 (1964);
*id.,* at 76 (Black, J., concurring); *Thornhill* v. *Alabama,* 310 U. S.
88 (1940).

[2] See S. Rep. No. 91–1080, p. 16 (1970). See also *id.,* at 17
(Chart 7: Projected Decline in Seafaring Job Opportunities in
Foreign Trade Fleet from 1969 to 1980).

[3] Those meager materials to be found in the congressional debates
concerning the Labor Management Relations Act contradict the
notion that Congress meant to distinguish among American working-
men for purposes of defining the Board's jurisdiction over labor
disputes affecting commerce. See H. R. Rep. No. 245, 80th Cong.,
1st Sess., 4 (1947), discussed in *Benz* v. *Compania Naviera Hidalgo,*

ties for the Board in its administration of the Act by making the Board's statutory jurisdiction turn on the identity of the competitor that might be affected by the picketing—a distinction relevant in the determination whether picketing is protected or prohibited activity under the Act, but a distinction rejected in other contexts in the determination of Board jurisdiction.[4]

There is, of course, no doubt that Congress possesses the power to subject foreign shipping in American terri-

353 U. S. 138, 142–144 (1957). See also *Longshoremen* v. *Ariadne Co.*, 397 U. S. 195, 198–199 (1970).

[4] Thus, the Court refused to make that distinction even where the language of the Act might have been read as indicating that Congress meant to draw it. In *Teamsters* v. *New York, N. H. & H. R. Co.*, 350 U. S. 155 (1956), a union engaged in the over-the-road trucking of freight picketed a railroad loading yard to protest the "piggy-backing" of truck trailers on railroad cars that was curtailing their opportunities for employment. The railroad, subject to the Railway Labor Act, 45 U. S. C. § 151 *et seq.*, was a "person" exempted from the NLRA's definition of "employer." 29 U. S. C. § 152 (2).

Nonetheless, the Court relied upon the finding of the lower court that the "union was in no way concerned with [the railroad's] labor policy," and held that the dispute was subject to the jurisdiction of the National Labor Relations Board. The Court said:

"This interpretation permits the harmonious effectuation of three distinct congressional objectives: (1) to provide orderly and peaceful procedures for protecting the rights of employers, employees and the public in labor disputes so as to promote the full, free flow of commerce, as expressed in § 1 (b) of the Labor Management Relations Act; (2) to maintain the traditional separate treatment of employer-employee relationships of railroads subject to the Railway Labor Act; and (3) to minimize 'diversities and conflicts likely to result from a variety of local procedures and attitudes toward labor controversies.' *Garner* v. *Teamsters Union*, 346 U. S. 485, 490." 350 U. S., at 160–161.

In contrast, there is no wording in the statute, or any legislative history, supporting a reading that Congress meant to draw that line as to seamen.

torial waters to the federal labor laws.[5]   And the Court concedes that the picketing activities involved here fall literally within the term "commerce" as used in the Labor Management Relations Act.   *Ante,* at 112.

After acknowledging the paucity of support for an exclusion in the term "commerce," the Court, however, concludes that prior cases construing the "affecting commerce" limitation in §§ 2 (6), 2 (7), and 10 (29 U. S. C. §§ 152 (6), 152 (7), and 160) support the holding that respondents' picketing against foreign-flag vessels is conduct not cognizable by the Board.   With respect, I think that the Court misreads those cases, and also fails to take account of other relevant congressional and judicial guidance that leads to a contrary conclusion.

As the Court concedes, none of the cases relied upon reached the question before us, that is, whether American seamen may employ economic weapons to try to save their jobs by improving the competitive positions of their domestic employers *vis-à-vis* foreign shipping.   Yet the Court relies upon those decisions as supporting the proposition that we must conclude that Congress "simply did not intend that Act [LMRA] to erase longstanding principles of comity and accommodation in international maritime trade," *ante,* at 112–113, because the *economic impact* upon foreign shipping from respondents' picketing might severely disrupt the maritime operations of foreign vessels.   Not a word or sentence in any opinion in those cases supports that reading.   Rather, those decisions

---

[5] See *Benz* v. *Compania Naviera Hidalgo, supra,* at 142:

"It is beyond question that a ship voluntarily entering the territorial limits of another country subjects itself to the laws and jurisdiction of that country.   *Wildenhus's Case,* 120 U. S. 1 (1887). . . . It follows that if Congress had so chosen, it could have made the Act applicable to wage disputes arising on foreign vessels between nationals of other countries when the vessel comes within our territorial waters."

rested squarely upon the reasoning that, in circumstances where Board cognizance of a dispute will necessarily involve Board inquiry into the *labor relations* between foreign crews and foreign vessels, Congress could not be understood to have granted the Board jurisdiction of the dispute.

In *Benz* v. *Compania Naviera Hidalgo,* 353 U. S. 138 (1957), the seminal case in this area, an American union attempted to organize the foreign crew of a vessel operating under a foreign flag. The Court, holding that Congress did not fashion the LMRA "to resolve labor disputes between nationals of other countries operating ships under foreign laws," *id.,* at 143, said:

> "It should be noted at the outset that the dispute from which these actions sprang arose on a foreign vessel. It was between a foreign employer and a foreign crew operating under an agreement made abroad under the laws of another nation. The only American connection was that the controversy erupted while the ship was transiently in a United States port and American labor unions participated in its picketing." *Id.,* at 142.

Similarly, subsequent decisions also turned jurisdiction on the determination whether Board cognizance would require the Board to inquire into the internal relations between the foreign ship's crew and its foreign owner. In *McCulloch* v. *Sociedad Nacional,* 372 U. S. 10 (1963), we held that the Board did not have jurisdiction to order an election on a foreign-flag vessel, for

> "to follow such a suggested procedure to the ulti-mate might require that the Board inquire into the internal discipline and order of all foreign vessels calling at American ports." *Id.,* at 19.

In *Incres S. S. Co.* v. *Maritime Workers,* 372 U. S. 24 (1963), the issue was whether the Board had power to

adjudicate the legality of the efforts of a union to organize the members of a foreign crew. Again, the Court held that the Board was without jurisdiction under the Act, since adjudication of that question would require that the Board examine into the relations between that crew and its foreign-flag employer. *Id.,* at 27–28.

The question whether a labor dispute would necessitate Board inquiry into the relations between foreign vessels and crews was yet again central in *Longshoremen* v. *Ariadne Co.,* 397 U. S. 195 (1970), the most recent of the cases where we sustained Board jurisdiction of a dispute involving picketing of a foreign-flag ship in protest against wages being paid to American longshoremen unloading the foreign vessel in an American port. We held that the prohibited inquiry would not result in that case, explaining:

> "We hold that [the longshoremen's] activities were not ['maritime operations of foreign-flag ships']. The American longshoremen's short-term, irregular and casual connection with the respective vessels plainly belied any involvement on their part with the ships' 'internal discipline and order.' Application of United States law to resolve a dispute over the wages paid the men for their longshore work, accordingly, would have threatened no interference in the internal affairs of foreign-flag ships likely to lead to conflict with foreign or international law. We therefore find that these longshore operations were in 'commerce' within the meaning of § 2 (6), and thus might have been subject to the regulatory power of the National Labor Relations Board." *Id.,* at 200.

Thus, the only appropriate issue in the instant case is whether NLRB cognizance of respondents' picketing

would require that the Board inquire into the "internal discipline and order" of foreign vessels, and thus threaten "interference in the internal affairs of foreign-flag ships likely to lead to conflict with foreign or international law." Tested by that principle, I conclude, contrary to the Court, that this case falls under *Ariadne* rather than under *Benz*.

*Ariadne* is the controlling precedent even if the Court is correct that this dispute "could not be accommodated by a wage decision on the part of the shipowners which would affect only wages paid within this country." *Ante,* at 114. For respondents' picketing is not directed at forcing the shipowners to make that or any other accommodation that could be characterized as interference with relations between crews and shipowners. Respondents' target is to persuade shippers not to patronize foreign vessels, and respondents have no concern with the form of the shipowners' response that makes their efforts succeed.[6]

Similarly, *Ariadne* is the controlling precedent even if the Court is right that "[v]irtually none of the predict-

---

[6] The picket signs were not directed to improvement of the foreign crews' wages and working conditions. The protest was carefully phrased to appeal to shippers not to patronize the foreign ships because payment of wages "substandard to those of American seamen . . . results in extreme damage to our wage standards and loss of our jobs." Thus, cognizance of the dispute to determine the legality of the picketing as an unfair labor practice need not involve the Board in an inquiry whether the picketing called for an employer response in the form of an increase in the crews' wages. This would not of course mean that respondents would prevail on the merits. There may well be a question, for example, whether the picketing falls within the ban of § 8 (b)(7), 29 U. S. C. § 158 (b)(7), as prohibited recognitional picketing. See Rosen, Area Standards Picketing, 23 Lab. L. J. 67 (1972); Note, Picketing for Area Standards: An Exception to Section 8 (b)(7), 1968 Duke L. J. 767.

able responses of a foreign shipowner to picketing of this type . . . would be limited to the sort of wage-cost decision benefiting American workingmen which the LMRA [as it amended the NLRA] was designed to regulate." *Ante,* at 115. The question whether this case falls within the Board's jurisdiction does not turn on the "predictable responses" of the foreign shipowner but, under our cases from *Benz* to *Ariadne,* solely on the question whether cognizance of respondents' activity would involve the Board in an examination into the internal relations between the foreign crews and shipowners. Cognizance of respondents' conduct in this case would not appear to require that inquiry. In any event, as the Texas Court of Civil Appeals correctly observed, it suffices for Board jurisdiction of that conduct that it is arguable whether that inquiry is required, for in such case it is for the Board to determine in the first instance whether that conduct involves a labor dispute within its cognizance. *San Diego Building Trades Council* v. *Garmon,* 359 U. S. 236 (1959).

But my disagreement with the Court does not rest alone on its failure adequately to rationalize and distinguish the case law. As the Court states, the Nation's labor laws must be read in light of the longstanding involvement of Congress with maritime affairs. If that involvement is examined, however, it will demonstrate that, beginning with its first session, 1 Stat. 55, Congress has been deeply engaged in legislating to protect American vessels from competition, usually by enacting discriminatory laws against foreign-flag vessels. Myriad hearings and reports reflect congressional determination that the American merchant marine, largely because of protections afforded American seamen's wages and working conditions in collective bargaining fostered by the National Labor Relations Act, shall have legislative help

to support its efforts to compete on equal terms for a share of our foreign commerce.[7]

This congressional support was highlighted as recently as 1970, in amendments to the Merchant Marine Act, 1936, 46 U. S. C. § 1101 *et seq.,* to which we may look with profit. The declaration of policy of that Act, as amended in 1970, states as its purpose that "[i]t is necessary for the national defense and development of [the United States'] foreign and domestic commerce that the United States shall have a merchant marine (a) sufficient to carry its domestic water-borne commerce and a substantial portion of the water-borne export and import foreign commerce of the United States . . . ." That merchant marine is further to be "owned and operated under the United States flag by citizens of the United States, insofar as may be practicable," and is to be "manned with a trained and efficient citizen personnel." 46 U. S. C. § 1101. See also Merchant Marine Act, 1920, 46 U. S. C. § 861. The 1936 Act furthers those aims by providing subsidies for the construction and operation of American-flag shipping, 46 U. S. C. §§ 1151, 1171, and goes far in imposing discriminations against foreign-flag shipping in regard to certain types of freight. 46 U. S. C.

---

[7] See, *e. g.,* H. R. Rep. No. 91–1073 (1970); S. Rep. No. 91–1080 (1970); Hearings on H. R. 12324 and H. R. 12569 before the Subcommittee on Merchant Marine of the House Committee on Merchant Marine & Fisheries, 92d Cong., 2d Sess. (1972) (Cargo for American Ships); Hearings on H. R. 15424, H. R. 15425, and H. R. 15640 before the Subcommittee on Merchant Marine of the House Committee on Merchant Marine & Fisheries, 91st Cong., 2d Sess. (1970) (President's Maritime Program, pt. 2); Hearings on S. 3287 before the Merchant Marine Subcommittee of the Senate Committee on Commerce, 91st Cong., 2d Sess. (1970) (the Maritime Program); Hearings on H. R. 1897, H. R. 2004, and H. R. 2331 before the House Committee on Merchant Marine & Fisheries, 88th Cong., 1st Sess. (1963) (Maritime Labor Legislation).

§ 1241. See also 46 U. S. C. §§ 251, 808 (restricting coastwise trade). Far from conduct in conflict with Congress' legislative policies in the maritime field, respondents' picketing seeks precisely the same goals.

Yet the Court, although not remotely suggesting that respondents' picketing constitutes an illegal intrusion by private citizens into foreign affairs, reaches a conclusion that necessarily implies that Congress was content to leave the whole problem to resolution by the States. It is inconceivable that Congress meant to leave regulation of activity in this area of predominantly national concern to disparate state laws reflecting parochial interests.

I would affirm the judgment of the Texas Court of Civil Appeals.