**Inacio LOBO, on behalf of himself and others similarly situated, Plaintiffs,**

v.

**CELEBRITY CRUISES, INC. and Federazione Italianan Transporti, Defendants.**

**Case No. 08–23386–CIV.**

United States District Court, S.D. Florida.

Sept. 10, 2009.

**1325**

Charles R. Lipcon, Jason Robert Margulies, Michael A. Winkleman, Lipcon Margulies & Alsina, Tonya Jean Meister, Meister Law LLC, Miami, FL, for Plaintiffs.

Sanford Lewis Bohrer, Scott Daniel Ponce, Holland & Knight, Kathleen Marie Phillips, Anne Janet Deases, Phillips Richard & Rind, Miami, FL, Richard J. Dodson, Dodson Hooks & Frederick APLC, Baton Rouge, LA, for Defendants.

---

*ORDER GRANTING IN PART*
*MOTIONS TO DISMISS*
*[DE 41, 45]*

ALAN S. GOLD, District Judge.

THIS CAUSE is before the Court upon Defendant Celebrity Cruises, Inc.'s and Defendant Federazione Italianan Transporti's ("Union") Motions to Dismiss Plaintiffs' Amended Complaint [DE 41 and 45]. Plaintiffs filed responses [DE 64 and 65], and Defendants filed replies [DE 72 and 75]. I held oral argument on the Motions on July 17, 2009. Having reviewed the pleadings and relevant case law, I conclude that the Labor Management Relations Act and the National Labor Relations Act do not apply to foreign seaman aboard foreign vessels, and that Plaintiffs have therefore failed to state a claim under Counts I and II of their Amended Complaint, the hybrid claims against Celebrity and the Union. I further conclude that, because the duty of fair representation is a judicially-created statutory duty under the federal labor laws, which laws do not apply to Plaintiffs' cause of action, it is unlikely that Count III, breach of duty of fair representation against the Union, can stand. However, because Count III was not fully briefed by the parties, and because I conclude that service of process by direct mail on the Union of non-translated documents was insufficient under the Hague Convention, I dismiss Count III without prejudice and permit Plaintiffs to file and serve a Second Amended Complaint in accordance with the guidance set forth in this Order.

**I. Background** [1]

Celebrity Cruises, Inc. ("Celebrity") is a foreign corporation registered to conduct business in Florida. (Am. Compl. ¶ 3). Celebrity is a resident of Florida and uses

1. On a Motion to Dismiss, I take all allegations in the Amended Complaint as true.

Miami, Florida as its base of operations for a passenger cruise line. (*Id.*). Plaintiffs are residents of India who were employed by Celebrity as cabin stewards aboard cruise ships. (*Id.* at ¶¶ 4–14). Plaintiffs' employment was governed by sign-on employment agreements which incorporated a Collective Bargaining Agreement ("CBA") between Federazione Italianan Transporti ("Union"), a non-resident of Florida, and Celebrity. (*Id.* at ¶¶ 21, 23). As cabin stewards, Plaintiffs typically provided services to approximately forty (40) passengers daily. (*Id.* at ¶ 24). Plaintiffs' compensation for these services consisted almost entirely of tips received from passengers. (*Id.* at ¶ 25). Plaintiffs' employment contracts required Celebrity to recommend to its passengers that they pay gratuities in accordance with the CBA, and Celebrity provided literature to its passengers stating that it is customary to pay gratuities to certain of its employees and suggesting a rate of $3.50 per person per day for cabin stewards. (*Id.* at ¶¶ 26, 30).

According to Plaintiffs, Celebrity placed assistant cabin stewards or assistant stateroom attendants on its ships to work in tandem with cabin stewards, and imposed upon cabin stewards, including Plaintiffs, a requirement to share personally the wages earned with the assistant cabin stewards. (*Id.* at ¶ 33). Celebrity did not suggest to its passengers that they pay any gratuity to the assistant cabin stewards. (*Id.* at ¶ 34). Additionally, before August 31, 2002, Celebrity imposed upon Plaintiffs a requirement that they share wages with the Chief Housekeeper, at a rate of $0.50 per passenger, per day, to the extent the passengers do not themselves provide such gratuities, which are suggested by Celebrity. (*Id.* at ¶ 36).

Plaintiffs allege that these requirements constitute a serious breach to the provisions of the CBA between Celebrity and the Union. Accordingly, on April 11, 2005, named Plaintiff Inacio Lobo filed a Second Amended Complaint against Celebrity in the United States District Court for the Southern District of Florida (Case No. 04–22132–ASG, "*Lobo I*"), alleging breach of the employment agreement. (*Id.* at ¶ 38). I evaluated the relevant contracts and governing law, and pursuant to the CBA and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, I compelled the parties in *Lobo I* to submit to arbitration. (*Id.*).[2]

According to the Amended Complaint, at the pre-arbitration conference, Plaintiff Lobo learned that Celebrity and the Union had exchanged the names of proposed arbitrators without Lobo's knowledge or input, and, despite Lobo's opposition, Celebrity and Union unilaterally appointed an arbitrator with minimal experience of knowledge in maritime matters, wage law, and class arbitration. (*Id.* at ¶ 41). On July 10, 2008, the first arbitration was held to determine whether the CBA prohibited class arbitration, and on September 11, 2008, the arbitrator denied class arbitration. (*Id.* at ¶ 42).

Plaintiffs allege that Union and Celebrity conspired to allow the failure of the petition for class action arbitration, and that such conduct was in breach of the Union's statutory duty of fair representation. Accordingly, on April 3, 2009, Plaintiffs filed an Amended Complaint

---

2. Lobo appealed my decision in *Lobo I*. *See Lobo v. Celebrity Cruises, Inc.,* 488 F.3d 891 (11th Cir.2007). The Eleventh Circuit held that, while the Seaman's Wage Act granted seaman a statutory right to sue in federal court, the Convention on the Recognition and Enforcement of Foreign Arbitral Awards compelled federal courts to direct qualifying disputes to arbitration. *Id.* The Eleventh Circuit therefore affirmed my order dismissing *Lobo I* in favor of arbitration. *Id.* at 896.

and Demand for Jury Trial [DE 37] ("Complaint"), including class action allegations, asserting three claims for relief: a Hybrid Claim Against Union for Breach of its Duty of Fair Representation (Count I), under the National Labor Relations Act, 29 U.S.C. § 159; a Hybrid Claim Against Celebrity for Breach of the Collective Bargaining Agreement and Violations under the Seaman's Wage Act, 46 U.S.C. § 10313 (Count II); and a Non-Hybrid Action Against Union for Breach of Duty [of] Fair Representation (Count III). Celebrity and the Union moved to dismiss Plaintiffs' Amended Complaint [DE 41 and 45].

## II. *Standard of Review*

On a motion to dismiss, the court accepts a complaint's well-pleaded allegations as true and evaluates all inferences derived from those facts in the light most favorable to the plaintiff. *Hill v. White,* 321 F.3d 1334, 1335 (11th Cir.2003); *Hoffend v. Villa,* 261 F.3d 1148, 1150 (11th Cir.2001). The court is not required to accept a plaintiff's legal conclusions, nor are conclusory allegations entitled to be assumed true. *Ashcroft v. Iqbal,* 556 U.S. ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (noting "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions"; stating conclusory allegations are "not entitled to be assumed true"). Although a plaintiff need not state in detail the facts upon which he bases his claim, Fed.R.Civ.P. 8(a)(2) demands "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal,* 129 S.Ct. at 1949; *see also Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1965 n. 3, 167 L.Ed.2d 929 (2007) (Fed. R.Civ.P. 8(a)(2) "still requires a 'showing,' rather than a blanket assertion, of entitlement to relief."). A complaint must state a plausible claim for relief, and "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949. The mere possibility the defendant acted unlawfully is insufficient to survive a motion to dismiss. *Id.* The well-pled allegations must nudge the claim "across the line from conceivable to plausible." *Twombly,* 550 U.S. at 570, 127 S.Ct. at 1974; *see also Sinaltrainal v. Coca–Cola Co.,* 578 F.3d 1252 (11th Cir.2009).

## III. *Analysis*

Defendants Celebrity and the Union seek to dismiss the Amended Complaint on multiple grounds. Celebrity argues that the Labor Management Relations Act and the National Labor Relations Act do not apply to foreign seaman aboard foreign vessels, and therefore do not apply to the hybrid claims asserted in Counts I and II of the Amended Complaint. Celebrity also argues that Plaintiffs' claims fail because there has been no arbitration decision on the merits of Plaintiffs' wage claims, and that Plaintiffs' claims are barred by the doctrine of laches. In addition to adopting and further briefing the substantive arguments raised by Celebrity, Defendant Union argues that it was not served properly under the Hague Convention, and contests personal jurisdiction in this Court.

During oral argument, I addressed with the parties the various possible grounds for dismissal and the procedure for handling the motions to dismiss. As to the Union, while I would generally address questions of personal jurisdiction before reaching the merits of a case, the parties agreed that it would be a more productive use of judicial resources, as well as the parties' resources, if I were to first address the substantive issues in the case. Further, Celebrity agreed that, while it provided alternate bases for dismissal, the

primary issue is whether the federal labor laws apply Plaintiffs' claims. I therefore turn first to the parties' arguments regarding the application of the Labor Management Relations Act and the National Labor Relations Act to Counts I and II of the Amended Complaint, Plaintiffs' hybrid claims against the Union and Celebrity. I then turn to Count III, Plaintiff's non-hybrid claim against the Union, and finally address service of translated documents under the Hague Convention.

### A. Counts I and II—Applicability of Labor Management Relations Act and National Labor Relations Act to Hybrid Claims

A hybrid claim is a type of claim in which an employee simultaneously asserts (1) a claim against his or her employer, pursuant to § 301 of the Labor Management Relations Act (the "LMRA"), for breach of a collective bargaining agreement, and (2) a claim against his or her union, which claim is implied under the National Labor Relations Act (the "NLRA"), for breach of the union's duty of fair representation. *See, e.g., DelCostello v. International Brotherhood of Teamsters,* 462 U.S. 151, 164–65, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983). The key issue in this case, as raised by Celebrity and the Union, is whether, under the Supreme Court precedent in what has been termed the *Benz* line of cases, the LMRA and the NLRA apply to the payment of wages to foreign seaman for work performed aboard foreign vessels. The parties agree that Plaintiffs' case raises an issue of first impression in the Eleventh Circuit, as the Eleventh Circuit has not applied the Supreme Court's *Benz* line of cases to the factual circumstances alleged by Plaintiffs. The parties further agree that there is no direct guidance from another circuit or another district court. Defendants suggest that this lack of precedent from circuit or district courts stems from the Su-

preme Court's law being so well-settled. Plaintiffs disagree, and argue the *Benz* line of cases are distinguishable, and this Court should follow alternate precedent, namely the *Lauritzen* and *Rhoditis* choice-of-law analysis previously employed in cases brought pursuant to the Jones Act.

It is interesting to note that the Union's attorney, Mr. Richard Dodson who appeared *pro hac vice* at oral argument and who generally represents plaintiff seafarers in maritime actions, acknowledged sympathy for Plaintiffs' position. Mr. Dodson argued that the federal labor laws, as drafted, do not provide protection to Plaintiffs, and that the remedy lies with Congress to change such laws. I concur with Mr. Dodson in expressing sympathy for Plaintiffs' position, which is compelling. However, as set forth in more detail below, I conclude that the law set forth in the *Benz* line of cases is too clear to ignore, and that the Labor Management Relations Act and the National Labor Relations Act do not apply to Plaintiffs' hybrid claims the Union and Celebrity, and dismiss the claims accordingly.

#### 1. *The Benz Line of Cases*

The scope of the LMRA and the NLRA has been outlined by the Supreme Court in the *Benz* line of cases. In *Benz v. Compania Naviera Hidalgo,* 353 U.S. 138, 77 S.Ct. 699, 1 L.Ed.2d 709 (1957), American unions supported and participated in picketing that followed a labor dispute that erupted while the flag ship of a foreign employer was temporarily docked in a United States port. The foreign ship operated with a foreign crew employed under a labor agreement negotiated pursuant to the laws of another country. The Supreme Court explained that, although Congress could have included foreign employers operating ships temporarily docked in United States waters within the jurisdiction of the NLRA, it did not do so:

It is beyond question that a ship voluntarily entering the territorial limits of another country subjects itself to the laws and jurisdiction of that country. *Wildenhus's Case,* 120 U.S. 1 [7 S.Ct. 385, 30 L.Ed. 565] (1887). The exercise of that jurisdiction is not mandatory but discretionary. Often, because of public policy or for other reasons, the local sovereign may exert only limited jurisdiction and sometimes none at all. *Cunard S.S. Co. v. Mellon,* 262 U.S. 100 [43 S.Ct. 504, 67 L.Ed. 894] (1923). It follows that if Congress had so chosen, it could have made the Act applicable to wage disputes arising on foreign vessels between nationals of. other countries when the vessel comes within our territorial waters. The question here therefore narrows to one of intent of the Congress as to the coverage of the Act.

353 U.S. at 142, 77 S.Ct. 699. The Supreme Court continued:

> The parties point to nothing in the Act itself or its legislative history that indicates in any way that the Congress intended to bring such disputes within the coverage of the Act.... Our study of the [NLRA] leaves us convinced that Congress did not fashion it to resolve labor disputes between nationals of other countries operating ships under foreign laws.

353 U.S. at 142, 143, 77 S.Ct. at 701–02 (footnote omitted). Notably, the Supreme Court pointed out that the NLRA had "been formulated as a bill of rights both for American workingmen and for their employers," and that the purpose of the legislation was to correct inadequacies that had deprived "the American workingman" of his dignity as an individual. 353 U.S. at 144, 77 S.Ct. 699. "What was said inescapably describes the boundaries of the Act as including only the workingmen of our own country and its possessions." *Id.*

A few years later, in *McCulloch v. Sociedad Nacional de Marineros de Honduras,* 372 U.S. 10, 83 S.Ct. 671, 9 L.Ed.2d 547 (1963), the Supreme Court evaluated the application of the NLRA to maritime operations of foreign-flag ships employing alien seaman. In that case, an American corporation, United Fruit, was the beneficial owner of a number of cargo vessels which made regular sailings between the United States, Latin America and other ports transporting the American corporation's products. *Id.* at 12, 83 S.Ct. 671. Each vessel was legally owned by a foreign subsidiary of the American corporation, flew the flag of a foreign nation, and carried a foreign crew. *Id.* A portion of United Fruit's fleet of beneficially owned vessels consisted of vessels legally owned by Empresa Hondurena de Vapores, a Honduran corporation, but all of the stock of that Honduran corporation was owned by United Fruit. *Id.* at 13, 83 S.Ct. 671. The crews on the vessels were recruited by Empresa Hondurena in Honduras and all of the crewmen were Honduran citizens who claimed Honduras as their residence and home port with the exception of one Jamaican. *Id.* The crew's wages, terms and conditions of employment, etc., were controlled by a bargaining agreement between Empresa Hondurena and a Honduran union, Sociedad Nacional de Marineros de Honduras. *Id.* at 14, 83 S.Ct. 671. However, United Fruit, the American parent corporation of Empresa Hondurena, determined the ports of call of the vessels, their cargoes and sailings, and integrated the Honduran vessels into its broader fleet organization. The Honduran vessels made regular and periodic stops at various ports between Central and South America as well as ports in the United States. *Id.*

An American union, the National Maritime Union of America, AFL–CIO, petitioned for certification as the representative of the crewmen employed on certain of

the Honduran vessels. *Id.* at 13, 83 S.Ct. 671. The NLRB granted the union's petition for certification, asserting jurisdiction based on its finding that the vessels' "maritime operations involved substantial United States contacts, outweighing the numerous foreign contacts present." *Id.* at 14–15, 83 S.Ct. 671, and the Honduran union sought an injunction to prevent the regional director of the NLRB from holding an election. *Id.* at 15–16, 83 S.Ct. 671.

The Supreme Court's inquiry turned on "the coverage of the National Labor Relations Act." 372 U.S. at 12, 83 S.Ct. 671, namely "whether the Act extends to the crews engaged in such a maritime operation." *Id.* Both sides agreed that Congress had the power to extend the coverage of the NLRA to "crews working foreign-flag ships, at least while they were in American waters[ ]." *Id.* at 17, 83 S.Ct. 671, but the question was "whether Congress had exercised that power." *Id.* In determining that it had jurisdiction over the case, the NLRB had used a "balancing of contacts" test, under which, if the Board found that the American contacts in the dispute were substantial, it asserted jurisdiction under the NLRA; however, if it found that the foreign contacts outweighed the American contacts, the Board concluded the NLRA did not apply and would not assert jurisdiction. *Id.* at 15, 17–18, 83 S.Ct. 671.

The Supreme Court evaluated the balancing test; it noted that using the Board's "balancing of contacts" test to determine jurisdiction might require that the NLRB inquire into the internal discipline and order of all foreign vessels calling at American ports, and would raise considerable disturbance in the field of maritime law and in our international relations. In addition, enforcement of Board orders would project the courts into application of the sanctions of the Act to foreign-flag ships on a purely ad hoc weighing of con-

tacts basis, which would be infeasible in practice and inevitably lead to embarrassment in foreign affairs. *Id.* at 19, 83 S.Ct. 671. Consequently, the Supreme Court rejected the Board's "balancing of contacts" test and concluded that the question before it was "more basic; namely, whether the Act as written was intended to have any application to foreign registered vessels employing alien seamen." *Id.*

After examining the language in the NLRA, the Court concluded "that the jurisdictional provisions of the Act do not extend to maritime operations of foreign-flag ships employing alien seamen." *Id.* at 13, 83 S.Ct. 671. The Supreme Court referenced *Benz* and noted, "as in *Benz*, [petitioners] have been unable to point to any specific language in the Act or in its extensive legislative history that reflects . . . a congressional intent" to bring "foreign-flag vessels within its coverage." *Id.* at 19, 83 S.Ct. 671. "Indeed, the opposite is true as we found in *Benz*, where we pointed to the language of Chairman Hartley characterizing the Act as a 'bill of rights for American workingmen and for their employers.'" *Id.* at 20, 83 S.Ct. 671 (citation omitted). Therefore, the Supreme Court "found no basis for a construction which would exert United States jurisdiction over and apply its laws to the internal management and affairs of the vessels here flying under the Honduran flag." *Id.* Citing again to the possibility of international discord, the Supreme Court noted that "the law of the flag state ordinarily governs the internal affairs of a ship," and held that since there was no affirmative expression in the NLRA or its legislative history that Congress intended the NLRB to have jurisdiction over foreign crews on foreign ships temporarily docked in American ports, the NLRB was without authority to order a representation

election for the foreign crew on a foreign ship. *Id.*[3]

In *Benz* and *McCulloch,* then, the Supreme Court made clear that the general terms of the NLRA and LMRA did not govern the respective rights and duties of a foreign ship and its crew because the NLRA standards would interfere with the foreign vessel's internal affairs in those circumstances. But *Benz* and its successor cases have not been read to exempt all organizational activity from the NLRA and LMRA's protections merely because these activities were directed at an employer who was the owner of a foreign-flagged vessel docked in an American port. Indeed, in *International Longshoremen's v. Ariadne Shipping Co.,* 397 U.S. 195, 198–201, 90 S.Ct. 872, 25 L.Ed.2d 218 (1970), the Supreme Court held that the NLRA does apply to labor relations between a foreign-flag ship and American longshoremen. Reflecting on *Benz* and *McCulloch,* the Court stated that in those cases, "we concluded that, since the Act primarily concerns strife between American employers and employees, we could reasonably expect Congress to have stated expressly any intention to include within its coverage disputes between foreign ships and their foreign crews." 397 U.S. at 198–99, 90 S.Ct. 872. However, in *Ariadne Shipping,* the dispute centered around wages to be paid American residents who were employed by a foreign ship not to serve as members of its crew, but rather to do casual longshore work. Citing no evidence that these occasional workers were involved in any internal affairs of the ship, the Court stated, "[t]hey were American

residents, hired to work exclusively on American docks as longshoremen, not as seaman on respondents' vessels"; noted the "dispute centered on wages to be paid to American residents;" and found the American workers were covered by the NLRA. *Id.* at 199, 90 S.Ct. 872.

Recently, in *Spector v. Norwegian Cruise Line Ltd.,* 545 U.S. 119, 125 S.Ct. 2169, 162 L.Ed.2d 97 (2005), the Supreme Court evaluated the above line of cases in the context of the applicability of Title III of the Americans with Disabilities Act to foreign-flagged cruise ships operating in United States waters. Regarding *Benz* and *McCulloch,* the Court stated:

> These cases recognized a narrow rule, applicable only to statutory duties that implicate the internal order of the foreign vessel rather than the welfare of American citizens. . . . This narrow clear statement rule is supported by sound principles of statutory construction. It is reasonable to presume Congress intends no interference with matters that are primarily of concern only to the ship and the foreign state in which it is registered. It is also reasonable, however, to presume Congress does intend its statutes to apply to entities in U.S. territory that serve, employ, or otherwise affect American citizens, or that affect the peace and tranquility of the United States, even if those entities happen to be foreign-flag ships.

545 U.S. at 121, 125 S.Ct. 2169. Noting the Court's application of the NLRA in *Ariadne Shipping,* the Court explained that assessing whether a statute interferes with the internal affairs of a foreign-

---

3. The same day as *McCulloch,* the Supreme Court decided *Incres S.S. Co. v. International Maritime Workers Union,* 372 U.S. 24, 83 S.Ct. 611, 9 L.Ed.2d 557 (1963), in which it held that the NLRA did not apply to a foreign-registered and flagged ship employing alien seaman: "The Board's jurisdiction to prevent unfair labor practices, like its jurisdiction to

direct elections, is based upon circumstances 'affecting commerce,' and we have concluded that maritime operations of foreign-flag ships employing alien seamen are not in 'commerce' within the meaning of s 2(6), 29 U.S.C. s 152(6)." 372 U.S. at 27, 83 S.Ct. 611.

flagged vessel, and whether, therefore, Congress must have provided a "clear statement" that the NLRA governs in that domain, is a "case-by-case" application. *Id.*

### 2. Application of the Benz Line of Cases to Plaintiffs' Claims

■ Applying the precedent set forth in *Benz, McCulloch,* and *Ariadne Shipping,* I conclude that the NLRA and LMRA do not govern Plaintiffs' dispute. While Defendant Celebrity uses Miami, Florida as its base of operations, Celebrity is a Liberian corporation whose vessels are foreign-registered and operate under foreign flags (DE 64–2, p. 27, indicating the Celebrity ships covered by the CBA are all registered in the Bahamas), and the wage dispute at issue undoubtedly concerns the internal affairs of the ship. *See McCulloch,* 372 U.S. at 17, 83 S.Ct. 671 (to construe the Act to embrace the "internal discipline and order" of a foreign ship would be to impute to Congress the highly unlikely intention of departing from the established rule that the law of the flag state ordinarily governs the internal affairs of the ship). Plaintiffs, residents of India, have offered no reason to deviate from Congressional intent indicating the purpose of the NLRA is to the protect rights of "*American* workingmen," (emphasis added) a purpose which has been reiterated in *Benz, McCulloch,* and *Spector. Cf. State Bank of India v. National Labor Relations Board,* 808 F.2d 526, 534 (7th Cir.1986) (holding NLRA applied to State Bank of India's activities in the United States because most employees are American citizens or American residents, and the "labor dispute centers on the wages to be paid American residents, foreign or natural . . ."). Nor does the wage dispute otherwise center around American citizens or residents. *Cf. Dowd v. International Longshoremen's Association, AFL–CIO,* 975 F.2d 779, 789–92 (11th Cir.1992) (holding NLRA applied to American labor union who induced Japanese unions to pressure Japanese importers not to import Florida citrus fruit loaded onto ships by nonunion labor because "[t]he boycott here did not aim at altering the terms of foreign crews on foreign-flag vessels"; rather, the object and effect of the conduct was to implement a secondary boycott within the United States). Finally, as to Plaintiffs argument that, because the CBA invokes Florida law, the federal labor laws apply, I disagree, as selecting a particular state's law does not automatically invoke the protections (or burdens) of all federal laws.

To attempt to distinguish the present case from the *Benz* line of cases, Plaintiffs argue that, under *Hellenic Lines Ltd. v. Rhoditis,* 398 U.S. 306, 90 S.Ct. 1731, 26 L.Ed.2d 252 (1970), Celebrity is not a foreign employer. *Rhoditis,* and its predecessor case *Lauritzen v. Larsen,* 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953), dictate a choice-of-law analysis to be used when a seaman brings a personal injury claim and there is a question as to whether the Jones Act or general maritime law governs compensation for his claim. Plaintiffs are not suing for personal injuries, nor are they suing under the Jones Act.[4] Further,

---

4. During oral argument, Plaintiffs referenced my recent Order Denying Motion to Dismiss in *Rozanska v. Princess Cruise Lines,* Case No. 07–23355 (August 5, 2008, DE 45), in which I stated, "The amendment to the Jones Act deleted the venue clause in the Jones Act. Such action by Congress evidences its strong policy to protect seamen." (*Id.* at p. 11, n. 5). The Jones Act amendment goes to show that Congress has elected to act in the context of the Jones Act, but has elected not to do so in the context of federal labor laws. *See, e.g., Benz,* 353 U.S. at 143–144, 77 S.Ct. 699 ("Our study of the Act leaves us convinced that Congress did not fashion it to resolve labor disputes between nationals of other countries operating ships under foreign laws."). As the Supreme Court stated in *McCulloch,* the remedy for such policy decisions lies with Congress:

Plaintiffs have failed to cite a single case, nor has the Court found any such cases in the Eleventh Circuit or otherwise, applying the *Rhoditis* choice-of-law analysis to an analysis of whether a foreign-flagged vessel and foreign corporation are United States employers for purposes of the NLRA and LMRA. *Cf. Dresdner Bank AG v. M/V OLYMPIA VOYAGER*, 446 F.3d 1377 (11th Cir.2006) (declining to extend the Supreme Court's "conflicts jurisprudence," beginning with *Lauritzen*, to maritime contract cases, and stating "the Supreme Court has not specifically laid down a choice of law approach in maritime contract cases."). Indeed, as discussed above, in evaluating the NLRB's balancing of contacts approach in *McCulloch*, the Supreme Court cited *Lauritzen* and noted that such procedure may be appropriate in different contexts, "such as the Jones Act, 46 U.S.C. § 688, where the pervasive regulation of the internal order of a ship may not be present." 372 U.S. at 19, n. 9, 83 S.Ct. 671, but expressly rejected the balancing of contacts approach in assessing whether the LMRA and NLRA applied to foreign vessels and their foreign crew.[5] *See also Windward Shipping (London) Ltd. v. American Radio Ass'n, AFL–CIO*, 415 U.S. 104, 94 S.Ct. 959, 39 L.Ed.2d 195 (1974) (citing *Lauritzen* and stating "analysis of the Jones Act there obviously involved different considerations from analysis of the Labor Management Relations Act here," but acknowledging that some arguments, such as extending the law to benefit foreign seaman are better directed at Congress than the courts). I therefore find unavailing Plaintiffs' argument that I should deem Celebrity a United States employer in the context of evaluating the applicability of the NLRA and LMRA.[6]

Plaintiffs also argue that the claims at issue in this case do not involve the internal affairs of a ship. Citing *Spector*, Plaintiffs contend that, because there is no apparent conflict with the law of a foreign jurisdiction, there is no desire for international comity, and therefore the wage dispute cannot said to concern the internal affairs of a foreign-flagged vessel. But Plaintiffs fail to properly read *Spector*. While the *Spector* Court acknowledged that "the precise content of the category of internal affairs ... is difficult to define with precision," and that "international comity" and "peace and tranquility of the port" are relevant, the Court ultimately concluded that if Title III required Norwegian Cruise Lines to remove physical barriers to access on board, it would "inter-

"[J]ust as we directed the parties in *Benz* to the Congress, which alone has the facilities necessary to make fairly such an important policy decision, we conclude here that the arguments should be directed to the Congress rather than to us." *McCulloch*, 372 U.S. at 22, 83 S.Ct. 671 (citations omitted).

**5.** During oral argument, Plaintiffs argues that, under *Rhoditis*, Celebrity should be considered an American employer, and the fact that they do substantial business here means that United States law will apply to them. I note that the Supreme Court did not apply the *Lauritzen / Rhoditis* analysis in *Spector* in assessing the applicability of Title III of the American with Disabilities Act to defendant Norwegian Cruise Line, a defendant that is essentially indistinguishable from Celebrity in

that its principal place of business is in Miami, Florida and it does substantial business in the United States. The Supreme Court's failure to apply the *Lauritzen / Rhoditis* choice-of-law analysis to Title III and its application to Norweigan Cruise Lines further supports my conclusion that, while such choice-of-law analysis may be appropriate for Jones Act cases, it is not appropriate for assessing the applicability of all federal laws.

**6.** Even if Celebrity were deemed a "United States employer," this alone would not be dispositive, as, in *McCulloch*, the beneficial ownership of the subject vessels by a United States entity did not serve to warrant application of the NLRA and LMRA to foreign seaman aboard foreign vessels.

fere with the internal affairs of foreign ships," as a "permanent and significant modification to a ship's physical structure goes to fundamental issues of ship design and construction, and it might be impossible for a ship to comply with all the requirements different jurisdictions might impose." *Spector*, 545 U.S. at 135, 125 S.Ct. 2169. The removal of physical barriers does not bear a substantial relation to the peace and tranquility of the port, nor does it present some grand issue of international comity. Like the physical barriers in *Spector*, the wage dispute at issue in the present case falls within the category of internal affairs of a foreign vessel without having the potential to compromise international security.

The Supreme Court's decision in *Windward Shipping (London) Ltd. v. American Radio Ass'n, AFL–CIO*, 415 U.S. 104, 94 S.Ct. 959, 39 L.Ed.2d 195 (1974) provides further guidance on the concept of "internal affairs of a foreign vessel" and supports the conclusion that the present wage dispute between Plaintiffs and Celebrity and the Union falls outside the scope of the LMRA and the NLRA. In *Windward*, the Supreme Court evaluated picketing activities at a United States port to determine if they were of the *"Benz"* or *"Ariadne"* variety. Petitioners, owners and managing agents of two ships which were registered under the laws of Liberia and fly the Liberian flag, sought injunctive relief in the state courts of Texas to prevent the picketing of their vessels by respondent unions, which were protesting as substandard the wages paid to foreign crewmen who manned the vessels. 415 U.S. at 105, 94 S.Ct. 959. The crews of both vessels were composed entirely of foreign nationals, represented by foreign unions. *Id.* at 106, 94 S.Ct. 959.

The *Windward* Court noted that the "picketing activities in this case do not involve the inescapable intrusion into the affairs of foreign ships that was present in *Benz* or *Incres* [*v. International Maritime Workers Union*, 372 U.S. 24, 83 S.Ct. 611, 9 L.Ed.2d 557 (1963)]; respondents seek neither to organize the foreign crews for purpose of representation nor to support foreign crews in their own wage dispute with a foreign shipowner." 415 U.S. at 113, 94 S.Ct. 959. Nevertheless, the Court concluded that the economic impact upon foreign shipping from the respondent unions' conduct might severely disrupt the maritime operations of the foreign vessels, as the pickets "hoped to exert sufficient pressure so that foreign vessels would be forced to raise their operating costs to levels comparable to those of American shippers," and "[s]uch a large-scale increase in operating costs would have more than a negligible impact on the 'maritime operations' of these foreign ships, and the effect would be by no means limited to costs incurred while in American ports." *Id.* at 114, 94 S.Ct. 959. "Virtually none of the predictable responses of a foreign shipowner to picketing of this type, therefore, would be limited to the sort of wage-cost decision benefitting American workingmen which the LMRA was designed to regulate." *Id.* at 115, 94 S.Ct. 959. The Court distinguished *Ariadne*, "Unlike *Ariadne*, the protest here could not be accommodated by a wage decision on the part of the shipowners which would affect only wages paid within this country", and concluded that the case fell under *Benz* rather than *Ariadne*.

■ Like *Windward*, the relief sought in the present case affects foreign workers, and the contest cannot be accommodated by a decision that affects wages paid only in this country. Moreover, like *Windward*, the response of Celebrity and the Union cannot be limited to a decision benefitting American workingmen, as there are no American workingmen seeking relief.

In sum, "the LMRA is concerned with industrial strife between American employers and employees." *Labor Union of Pico Korea, Ltd. v. Pico Products, Inc.*, 968 F.2d 191, 195 (2d Cir.1992). I therefore conclude that the LMRA and the NLRA do not apply Plaintiffs' dispute, and I dismiss Counts I and II of the Amended Complaint with prejudice.[7]

**B. Count III—Non–Hybrid Action Against Union for Breach of Duty of Fair Representation**

In Count III, Plaintiff asserts a "Non–Hybrid Action Against Union for Breach of Duty [of] Fair Representation," alleging "a separate, individual, and unique non-hybrid claim of breach of duty of fair representation against Defendant Union, separate and apart from any hybrid or non-hybrid claim he may have against Defendants, as established by 29 U.S.C. 159." Plaintiffs and the Union have not fully briefed the issue of whether a duty of fair representation exists outside of the federal labor laws, but I have independently evaluated the question based on the Union's motion to dismiss the full Amended Com-

plaint, and I have found no indication that such duty exists. Because I will dismiss this Count for insufficient service, as explained in Section C, below, do not directly rule on the question, but I raise my concerns in the event Plaintiffs elect to modify this Count when serving a Second Amended Complaint.

Courts have characterized a union's duty of fair representation as a judicial construction arising under the federal labor laws:

> The union's duty of fair representation, first enunciated by the Supreme Court in *Steele v. Louisville & Nashville Railroad Co.*, 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944), requires the exclusive bargaining representative "to serve the interest of all members without hostility or discrimination toward any." *Vaca v. Sipes, supra,* [386 U.S. 171] at 177 (65 S.Ct. 226) [87 S.Ct. 903, 17 L.Ed.2d 842 (1967)]. This duty was derived from a union's statutory right to be the exclusive representative of the members of a designated unit, from which the Supreme Court found an implied statutory obligation to give members equal repre-

---

7. Plaintiffs also argue that, under the plain language of the LMRA, 29 U.S.C. § 152(3), "employee" refers to "any employee." *See Sure–Tan, Inc. v. N.L.R.B.*, 467 U.S. 883, 104 S.Ct. 2803, 81 L.Ed.2d 732 (1984) (referring to breadth of definition as "striking"). Plaintiffs are correct that a court should first look to the plain language of the Act in assessing its application. However, Plaintiffs do not explain why, having knowledge of the LMRA's definitions, the Supreme Court has repeatedly held that the LMRA does not apply to foreign seaman aboard foreign vessels, as in *Benz* and *McCulloch*. Similarly, I find unavailing Plaintiffs' arguments that applying the LMRA to Plaintiffs furthers the legislative intent of encouraging the making of collective agreements, as this argument fails to address the contrary Supreme Court precedent.

Finally, I do not find compelling Plaintiffs' reliance on *Bulk v. Arguelles*. Plaintiffs argue that, because *Bulk v. Arguelles*, 400 U.S. 351,

91 S.Ct. 409, 27 L.Ed.2d 456 (1971), permits foreign seaman to seek relief under § 301 of the LMRA as well as the Seaman's Wage Act (46 U.S.C. § 596), Plaintiffs must be entitled to remedies of the LMRA. Plaintiff Arguelles, although a citizen of the Phillipine Islands, had been a resident of Baltimore, Maryland for a number of years; was a member of the National Maritime Union of America, an affiliate of AFL–CIO; and was working an American merchant vessel. *Arguelles v. U.S. Bulk Carriers, Inc.*, 408 F.2d 1065, 1066, 1068 (4th Cir.1969). *Arguelles* is thus readily distinguishable from this action, where Plaintiffs are neither residents nor citizens of the United States, were not members of an American union, and did not work aboard an American vessel. Indeed, as Arguelles was a United States resident working aboard a United States vessel, the *Arguelles* court did not evaluate the applicability of the LMRA to foreign seaman aboard a foreign vessel.

sentation. *See Ford Motor Co. v. Huffman*, 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1953). **The duty of fair representation is thus a federal obligation which has been judicially fashioned from national labor statutes.** *Abrams v. Carrier Corp.*, 434 F.2d 1234, 1251 (2d Cir.1970), cert. denied, 401 U.S. 1009, 91 S.Ct. 1253, 28 L.Ed.2d 545 (1971).

*Kaiser v. Local No. 83*, 577 F.2d 642, 644–645 (9th Cir.1978) (emphasis added); *Abrams v. Carrier Corp.*, 434 F.2d 1234 (2d Cir.1970) (same). Various district courts have followed suit. *See, e.g. Arnold v. Air Midwest, Inc.*, 1994 WL 247442, *4–5 (D.Kan. May 24, 1994) ("The duty of fair representation is a federal obligation which has been judicially fashioned from national labor statutes. There is no explicit statutory requirement of fair representation. Rather, the duty of fair representation was judicially developed as a necessary corollary to the status of exclusive representative provided for by section 9(a) of the NLRA and section 2, ninth, of the Railway Labor Act."); *Thompson v. United Transp. Union*, 2008 WL 4377137 (N.D.Iowa Sept. 25, 2008) (same); *Kollman v. International Broth. of Elec. Workers*, 2003 WL 22047882, at *2–3 (N.D.Ga.2003) ("Although there is no explicit statutory requirement setting forth a union's duty of fair representation, it is thus a federal obligation which has been judicially fashioned from national labor statutes. The courts developed the duty of fair representation as a corollary to a union's status as the exclusive representative for employees in a bargaining unit under Section 9(a) of the National Labor

Relations Act." (citations omitted)). Thus, it appears there is no *federal* duty of fair representation apart from those created by the National Labor Relations Act and the Labor Management Relations Act, which I have held not to apply in this matter.

If Plaintiffs are attempting to plead a duty of fair representation grounded in *Florida* law, I do not readily find that such duty exists for private unions. Part Two of the Florida Statutes, Chapter 447 provides a method for resolving labor disputes between public employers and public employees, but no parallel duty appears to exist against private unions, nor do Plaintiffs plead in the Amended Complaint or explain in their Responses to the Motions to Dismiss where such duty arises. Accordingly, at this juncture, it is not apparent how Plaintiffs could overcome the challenges of the case law cited above and state a claim against the Union for breach of a duty of fair representation. However, because the matter was not fully briefed and because I dismiss the Count for improper service, as set forth below, I dismiss Count III without prejudice and permit Plaintiffs to replead and / or re-serve the Count against the Union.[8]

## C. Service of Process on Defendant Union Under the Hague Convention

Defendant Union next contests the adequacy of service of process under the Hague Convention. The Union argues that it should have been served through the Italian central authority, as required by Article 5 of the Hague Convention, and that service of untranslated documents[9] by direct mail to the Union was improper.

---

**8.** Plaintiffs have two options. They may replead Count III and serve it upon the Union in accordance with the guidance provided in Section C, or they may re-serve Count III as is, and I will address it on the merits directly once it is fully briefed by Plaintiffs and the Union.

**9.** In their Response to the Union's Motion to Dismiss, Plaintiffs do not dispute that the Complaint, Summons, and Letter were sent in English, rather than Italian.

Plaintiffs argue that service upon the Union was proper under Fla. Stat. § 48.161, which permits substituted service on nonresidents, and Article 10(a) of the Hague Convention, which permits judicial documents to be "sent" directly to a defendant. Having reviewed the parties' arguments and the relevant case law, I concur that service on the Union by direct mail was improper because Plaintiffs did not provide translated documents.

■ The United States and Italy are both signatories to the Hague Convention on the Service Abroad of Judicial and Extra-Judicial Documents in Civil and Commercial Matters ("Hague Convention").[10] The Supreme Court set out the test for the applicability of the Hague Service Convention in *Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 108 S.Ct. 2104, 100 L.Ed.2d 722 (1988). The Convention itself states that it shall apply "in all cases ... where there is occasion to transmit a judicial or extrajudicial document for service abroad." *Schlunk*, 486 U.S. at 699, 108 S.Ct. 2104 (citing 20 U.S.T. 362, 362), and the Supreme Court held that whether an "occasion ... for service abroad" existed depended on the internal law of the forum state: "If the internal law of the forum state defines the applicable method of serving process as requiring the transmittal of documents abroad, then the Hague Service Convention applies." *Id.* at 700, 108 S.Ct. 2104.

Here, Plaintiffs contend they properly served the Union under Fla. Stat. § 48.161, entitled "Method of substituted service on nonresident," which permits service upon the Florida Secretary of State and then requires notice of service and a copy of the process to be sent to the foreign defendant. *See* Fla. Stat. § 48.161.[11] Because Fla. Stat. § 48.161 re-

---

10. The Supreme Court explained the history of the service provisions of the Hague Convention in *Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 108 S.Ct. 2104, 100 L.Ed.2d 722 (1988):

The Hague Service Convention is a multilateral treaty that was formulated in 1964 by the Tenth Session of the Hague Conference of Private International Law. The Convention revised parts of the Hague Conventions on Civil Procedure of 1905 and 1954. The revision was intended to provide a simpler way to serve process abroad, to assure that defendants sued in foreign jurisdictions would receive actual and timely notice of suit, and to facilitate proof of service abroad. 3 1964 Conférence de la Haye de Droit International Privé, Actes et Documents de la Dixiéme Session (Notification) 75–77, 363 (1965) (3 Actes et Documents); 1 B. Ristau, International Judicial Assistance (Civil and Commercial) § 4–1 (1984 and 1 Supp.1986) (1 Ristau).

11. The full text of Fla. Stat. § 48.161 states: When authorized by law, substituted service of process on a nonresident or a person who conceals his or her whereabouts by serving a public officer designated by law shall be made by leaving a copy of the process with a fee of $8.75 with the public officer or in his or her office or by mailing the copies by certified mail to the public officer with the fee. The service is sufficient service on a defendant who has appointed a public officer as his or her agent for the service of process. Notice of service and a copy of the process shall be sent forthwith by registered or certified mail by the plaintiff or his or her attorney to the defendant, and the defendant's return receipt and the affidavit of the plaintiff or his or her attorney of compliance shall be filed on or before the return day of the process or within such time as the court allows, or the notice and copy shall be served on the defendant, if found within the state, by an officer authorized to serve legal process, or if found without the state, by a sheriff or a deputy sheriff of any county of this state or any duly constituted public officer qualified to serve like process in the state or jurisdiction where the defendant is found. The officer's return showing service shall be filed on or before the return day of the process or within such time as the court allows. The fee paid by the plaintiff to the public officer shall be taxed as cost if he or she prevails in the action. The public officer shall keep a record of all process served

quires "the transmittal of documents abroad," under *Schlunk*, the Hague Convention applies to Plaintiffs' service of the Union. *See also Vega Glen v. Club Mediterranee S.A.*, 359 F.Supp.2d 1352, 1356 (S.D.Fla.2005) (holding Hague Convention applies to service of foreign defendant pursuant to Fla. Stat. §§ 48.181 and 48.161); *McClenon v. Nissan Motor Corp.*, 726 F.Supp. 822 (N.D.Fla.1989) (holding, because Fla. Stat. § 48.161 required "sending of notice and process directly to the defendant," under *Schlunk*, Hague Convention applies).

■ Generally, the Hague Convention requires each state to establish a central authority to receive requests for service of documents from other countries. *Schlunk*, 486 U.S. at 698–99, 108 S.Ct. 2104 (citing 20 U.S.T. 362, T.I.A.S. 6638, Art. 2). Once a central authority receives a request in the proper form, it must serve the documents by a method prescribed by the internal law of the receiving state or by a method designated by the requester and compatible with that law. *Id.* (citing 20 U.S.T. 362, T.I.A.S. 6638, Art. 5.). However, Article 10 of the Hague Convention provides several exceptions to the procedure set forth in Article 5. Specifically, Article 10(a) states that, provided the State of destination does not object, "the present Convention shall not interfere with ... (a) the freedom to send judicial documents, by postal channels, directly to persons abroad." To that end, several Circuits have concluded the word "send" includes service of process, and have permitted service by direct mail under Article 10(a), without resorting to the complicated procedures set forth in Article 5. *See, e.g., Brockmeyer v. May*, 383 F.3d 798, 808 (9th Cir.2004); *Ackermann v. Levine*, 788 F.2d 830, 839 (2d Cir.1986). Others have held that the freedom to "send judicial documents" under Article

10(a) does not include "service of process," but rather encompasses documents sent only after service of process is effected. *See Nuovo Pignone, SpA v. STORMAN ASIA M/V*, 310 F.3d 374, 384 (5th Cir. 2002); *Bankston v. Toyota Motor Corp.*, 889 F.2d 172, 174 (8th Cir.1989). The Eleventh Circuit has not ruled on the matter, and my sister courts in this circuit are split. *Compare Conax Florida Corp. v. Astrium Ltd.*, 499 F.Supp.2d 1287 (M.D.Fla.2007) ("[C]onsistent with those decisions construing Article 10(a) of the Hague Convention to permit service of process by mail if the state law provides such an option, and the receiving country does not object, I find that the plaintiff's service of process upon the defendant in accordance with §§ 48.161 and 48.181, Fla. Stat., does not violate the Hague Convention."); *Lestrade v. U.S.*, 945 F.Supp. 1557, 1559 (S.D.Fla.1996) (holding term "send" in Article 10(a) also means "serve") *with Arco Electronics Control Ltd. v. Core Intern.*, 794 F.Supp. 1144 (S.D.Fla.1992) ("The question of whether ARCO's service of process complied with the Hague Convention turns on whether Article 10(a) provides for a method of service at all. The Court finds that it does not."); *Marschauser v. Travelers Indem. Co.*, 145 F.R.D. 605, 609 (S.D.Fla.1992) ("Article 10 only provides for alternative means of service and for the sending of documents, and it has no bearing on Articles 3–6, which prescribe the normal method of service under the Convention.").

Without reaching a decision on whether Article 10(a) permits direct service by mail, I note that there is also a split on whether direct mail service under Article 10(a) requires the documents sent by direct mail be translated into the language of the recipient country, in this case Italian. Several districts have held that only

on him or her showing the day and hour of service.

Article 5 service through a central authority requires translation of the documents, and Article 10(a) has no such requirement. *See, e.g. Heredia v. Transport S.A.S., Inc.,* 101 F.Supp.2d 158, 161 (S.D.N.Y.2000) ("[W]here service is made by registered mail under Article 10, the served documents need not be translated."); *Weight v. Kawasaki Heavy Indus.,* 597 F.Supp. 1082, 1086 (E.D.Va.1984) ("A Japanese translation is required only when the service of process is transmitted through the 'Central Authority' pursuant to Article 5 of the Convention.... However, Article 10(a) of the Convention contains no such requirement for direct postal service."). Other courts have held that, to serve process under Article 10(a), the documentation must be translated into the language of the receiving country. *See, e.g., Borschow Hosp. and Medical Supplies, Inc. v. Burdick–Siemens Corp.,* 143 F.R.D. 472 (D.P.R.1992).

As the *Borschow* court reasoned, "The aim of service is to (1) apprise parties of the commencement of an action and (2) afford sufficient time to enter an informed response. Neither is accomplished by allowing service to be packaged in a foreign language, particularly when the recipient may be a private citizen." 143 F.R.D. at 480. I find the analysis of the *Borschow* court compelling. Without determining whether Article 10(a) permits service by direct mail, I conclude that, if it does, such service must include translated documents. It is undisputed that Plaintiffs mailed to the Union English-language documents, and failed to translate these documents into Italian. I therefore conclude that service upon the Union was improper under the Hague Convention.[12]

### IV. Conclusion

For the reasons stated above, I dismiss Counts I and II of Plaintiffs' Amended Complaint with prejudice. Based on the case law suggesting there is no statutory or common law duty of fair representation aside from the federal labor laws, which I have held to not apply to this case, I raise concerns about the merits of Count III, and also dismiss it without prejudice for improper service. I permit Plaintiffs leave to re-plead (if they so choose) and re-serve Count III, as a Second Amended Complaint, upon the Union, complying with the rulings and guidance set forth in this Order. If and when Plaintiffs file and serve a Second Amended Complaint, the Union may file a motion to dismiss reasserting the personal jurisdiction challenges set forth in their present motion to dismiss, and asserting any challenges to the merits of the remaining non-hybrid count. As I did in evaluating Plaintiff's Amended Complaint, to save the parties the potentially unnecessary cost and burden of jurisdictional discovery, I will first evaluate whether Plaintiffs have stated a claim in the Second Amended Complaint, and then reach questions of personal jurisdiction. Accordingly, it is hereby

### ORDERED AND ADJUDGED:

12. As an alternative to service under the Hague Convention, Plaintiffs argue that service upon the Union's agent, Kathleen Phillips, constituted proper service on the Union. Without reaching the question of whether Kathleen Phillips is in fact the Union's agent, because Plaintiffs did not send translated documents to the Defendant Union, service of Kathleen Phillips was insufficient under Fla. Stat. § 48.161.

Further, because I dismiss all of the Counts in the Amended Complaint on alternate grounds, with the parties' consent and in an effort to conserve the parties' resources, I do not reach the Union's personal jurisdiction challenge or Plaintiffs' request for jurisdictional discovery at this juncture.

1. Defendant Celebrity Cruises, Inc.'s Motion to Dismiss [DE 41] is GRANTED in PART.
2. Defendant Federazione Italianan Transport's Motion to Dismiss [DE 45] is GRANTED in PART.
3. Counts I and II of the Amended Complaint are DISMISSED WITH PREJUDICE.
4. Count III of the Amended Complaint is DISMISSED WITHOUT PREJUDICE.
5. Plaintiffs may file and serve a Second Amended Complaint against the Union by September 25, 2009.
6. This case is CLOSED and may be reopened upon the service of a Second Amended Complaint.